Good afternoon. May it please the court, my name is Renee Pietropalo. I represent William Morena. With the court's permission, I'd like to request four minutes for rebuttal. Yes, that's granted. Were you counsel at the trial level? No. Was your firm counsel at the trial level? No. I have to tell you that I think this is one of the worst counsel cases that I have come across. I agree with you, of course, 100%. The key government witness accused defense counsel of paying him $20 to recant. That very accusation, whether the accusation is true or false, created an actual conflict of interest because from that moment, defense counsel's interest in exonerating himself from criminal charges and avoiding disciplinary action and reputational damage and even just in continuing to receive his fee, diverged from that of his clients. Well, if that's true, wouldn't it be an ineffective? You know, I don't know the answer as to whether an attorney's conflict of interest is ineffective assistance of counsel. I know that certainly that issue has been handled on direct appeal. I think Judge Aldersert's experience isn't even longer than mine, but I think we've had cases in which that's come up on direct appeal and maybe also something that can come up on a collateral attack, but not twice, not both ways. I can't see how a conflict of interest cannot be under the rubric of inefficiency of counsel. I think it is, and I don't think we can notice it on direct appeal. It's a Sixth Amendment right to counsel issue, certainly, but it's conflict of counsel rather than ineffectiveness of counsel because the issue is counsel's loyalty... Well, I would say that all ineffective assistance of counsel did not come under conflict of interest, but the reverse is true, that all conflicts of interest do come under ineffective assistance of counsel. That's my own view. Well, the government of Virgin Islands versus ZEP, which is a case I believe I cited in my 28J letter, does answer the question that a conflict of interest case such as the one I'm presenting here is cognizable on direct appeal. Don't you in the conflict of interest case have to show that the conflict adversely affected the rights of the defendant? Yes, I do, Your Honor. So just the fact that there's a conflict of interest, that's not the end of the story. That's not enough. There's a second inquiry, and that is did the conflict adversely affect the representation? In here it does, and it does in several different ways. The way to show adverse effect, as this Court is well aware, is to show that there are plausible defense strategies that could have been pursued but that weren't pursued. But, Tina, that's, as Judge Aldersert says, that's always one of the issues that you're going to have in a collateral attack on effectiveness of counsel. I'm not sure why a court on direct appeal is going to get into that. Well, I can say — Because, you know, what you really need is a hearing, and you have to — Well, I don't know how you could say that. I respectfully would point the Court to United States v. Merlino, where it certainly was a conflict of interest case based on very similar allegations, though not as egregious, you could argue. That was a direct appeal case. Judge Fuentes was on that panel. There was no worry about whether or not the Court could address it in a direct appeal and that it needed to go to habeas. Of course not. It's the same thing in the Zepp case that I referred to earlier, and there's a series of cases out of the Second Circuit that say exactly the same thing. May I inquire, since your emphasis on your second issue, are you no longer confident that you could win out on the prosecutorial conduct being plain error? Yep. I think as clear as the day is long. I'm confident. And if you win on that, why do you want to worry about this conflict of interest issue? I'm confident that we win on plain error on the second issue of prosecutorial misconduct and on the 404B. I agree with Judge Aldister, frankly, that the conflict of interest issue is such a minor part of what's really before us. Why don't you go to the principal issue that's before us and pick up exactly what Judge Aldister directed you to? I mean, I agree with him. I don't know whether Judge Fuentes. Plain error sounds good to me. Certainly. I will do that. The prosecutorial misconduct here was repeatedly going beyond the scope of the 404B rulings. It was injecting unrelated heroin dealing and other crimes evidence and other... But why didn't... I don't understand why didn't... Wasn't there a stipulation that he had a prior felony so that you wouldn't get in any of this evidence about what the prior felony was? Why wasn't there a stipulation of the reason that he wasn't there at the time? They didn't have to go into he was in jail or all that? I submit, Your Honor, and I don't want to talk about something that you don't want to talk about, but I submit that this lawyer wasn't just a bad lawyer. He didn't do his job because he was operating under a conflict of interest. I believe that his fear... I think you're talking about a bad lawyer. In my judgment, the bad lawyer was the prosecutor. And I think that what he said is reversible error. Nobody was holding the prosecutor... Why don't you start talking about that? Certainly, Your Honor. Again, you've read the record, and you're as familiar with it as I am at this point. The evidence of drugs was admitted for very limited reasons. Can I put a question to follow up on Judge Aldis? I tend to agree that the prosecutor in this case went overboard. But could you tell me how that prejudiced the issue of the shotgun that was found in his house or apartment? In other words, the prejudice found... That Palmer testified to. Right, that Palmer testified to, told the police exactly where it was. And the only thing he's convicted of is possession of a firearm by a felon. So how did all this evidence of drug activity prejudice the jury in convicting him of possession of a shotgun found in his house? Well, because the evidence of the shotgun is that the shotgun is found in the heating duct of a house that he lives in, hidden in the heating duct, might I say. There was bullets or shells that matched, arguably, the ones that were found in the weapon that were also located in the house, but not anywhere... They said they were in a shelving unit somewhere, so it's not... But that doesn't answer Judge Francis' question. Well, I'm saying that the evidence against him of the possession of the shotgun was so weak that the reason he was... I think he testified to the fact that he was in the place and he saw the... And that he showed him, that Marina showed him the shotgun. But we know now that Mr. Palmer was completely incredible, and the reason his credibility wasn't properly... He may have been a complete liar, I mean, from day one. But he knew that there was a shotgun there and told the police where it was, and when the police went in the house, they found the shotgun in an air vent. That was open. Well, first of all, the whole conversation... And then they found the tape around the trigger well that was also the same type of tape on a drug scale, shotgun shells in the bathroom, in the stairs, the same shells that belonged in that shotgun. The question for the jury was, was this shotgun in the defendant's possession, constructive or otherwise? If they disbelieve... How did the prosecutors come to prejudice that... Counselor, Counselor, isn't your answer to Judge Schuette's question that true? The sole issue under the indictment was possession of the firearm, but the constant, constant dripping reference to drug was so pervasive that we don't know whether that did influence the jury. Is that... That's exactly right. That's exactly what the district court... That's what you have to do. You have to say yes and stop right there. Yes. I'm going to make a suggestion. I don't know if my colleagues will agree. I would like to hear from the prosecutor, and I think that time in between, the time that she didn't get now, should be added on to her rebuttal. Is that okay with you? I agree. All right. Thank you. Thank you, Judge Oldenstern. Ms. Irwin, you have a big job ahead. May it please the Court, Laura Irwin from the U.S. Attorney's Office in the Western District, on behalf of the government in this case. Question number one, why didn't you charge him with drugs? Why did you limit... I mean, there was a lot of evidence of drug running out of this house. Why was he charged with possession of a firearm? Your Honor, I know the first rule of appellate advocacy, especially when you have an office that's divided between trial attorneys and appellate lawyers, is you should always know the answer to every question. But I have to be honest and tell you I don't know the answer to that. It was the prosecutor's decision, and I don't know why. But I think it's a fair question, and I'm sorry that I don't know the answer. My second question is, why did they have to show the basis for the search warrant, which got in all this other extraneous evidence? Wasn't it enough that there was a search warrant? I mean, I don't understand this whole... Obviously, all three of us have gone through it very carefully. Do you have to... Ordinarily, isn't it enough to say we have had a search warrant? Why did you... Why did the judge allow you, or why did you, your office, go into all this background as to why they had a search warrant? Because the office recognized, the prosecutor recognized, that in cases of constructive possession, it's often a difficult case to make, and we believed that we needed to show a motive. And that was the reason why we sought to introduce this evidence. Are there any cases... Isn't this a flat... I wondered about this. A flat case, possession by a felon of a firearm. Are there cases that show you have to say, you have to show the motive, why the felon possessed it? Well, Your Honor, this case was two counts. It was felon in possession, as well as a sawed-off shotgun. And I think that's what made the difference, is because it was a sawed-off shotgun. Why is motive necessary... relevant? Because it's such an unusual item to possess. It's not something you see very often, whereas the felon in possession... My guess is that it goes on a lot. We may not see it often. Well, let's hope not. Do you have cases that say, this seems to me a straight case of possession, and you don't need motive. Well, 404B does allow you to put in motive. Well, in an appropriate case. Right. It doesn't say motive in a possession of a firearm case. Well, he challenged every element of this case. He wouldn't stipulate to anything. So we felt like we needed to go back, and because it was a constructive possession case, offer the jury something they could hang their hat on as to motive. And I think I'd like to address squarely, Judge Aldisert, and I think the entire panel's concern, about the lawyering in this case. Including the prosecutor. Right. And I would like to get that, but first I would like to say that when we were working on this case, our view was this was a case of ineffective assistance. And I can explain that's why. I'm going to address what the prosecutor did. And we suggested that the case be remanded for a hearing on ineffective assistance, allowing the defendant to preserve every issue he's raised on appeal. And there was no, we could not reach an agreement on that. So we understand that this is a case that involves questionable acts with regard to the defense lawyer. Well, I'd like to ask about the prosecutor conduct. Okay. Because the judge kept saying, you're getting into drugs and that's not the issue in this case. And the prosecutor then proceeds time after time to keep putting in the drug evidence. How do you, how can you? I think the answer to that, Your Honor, is a review of the entire case from beginning to end. This is a very record sensitive case. If you go back to the pretrial conference, at which the prosecutor came in and said, I'd like to bring in this 404B evidence about motive. He has a detailed discussion with the district court. And when the district court turns to Attorney Hudak, Attorney Hudak's response is very telling. And I think it set the tone. And you can see a progression that goes through the case about drugs. He says, this is on page 66 of the record, we would ask that all testimony of drugs be excluded. And then from there he goes on. He doesn't talk about any of the 404B. He doesn't talk about appropriate purpose. He doesn't talk about relevancy. He doesn't talk about prejudice. He goes on to attack the evidence and says, I'm going to challenge this evidence. I'm going to challenge Dale Palmer's credibility. But he did ask that it be excluded. And the judge himself kept saying, this isn't really relevant. And he kept getting it in at every possible opportunity, even when he didn't have the opportunity, shouldn't have had the opportunity. I appreciate what you're saying. And I realize the record shows that. But I think the record also has to be read in context of, you go then to openings at which the defense lawyer says, he talks about in excruciating detail, more detail than the prosecutor did, about this other evidence. He says, and this is on page 117 of the record, the drugs contaminate this case. He goes on to say, you've got to have motive. He uses the word motive when the prosecutor didn't use the word motive. And let's say Billy Marina is a drug dealer. Let's say that drug dealers actually need firearms because they're engaged in dangerous activity. But we're going to show you that he's not a drug dealer. The defense in this case was to embrace the notion of drugs being an inherent part of this case. And that's why to us it comes back to, is this a defense that Billy Marina consented to? Is this something, an approach he wanted to take? Because at every turn, every cross-examination, everybody talked about drugs. I agree, the prosecutor talked about it. The defense lawyer talked about it. Yeah, but the prosecutor has an obligation to justice. And the prosecutor, and we know that from the Burger case in the Supreme Court many, many years ago. And I just don't see how we could excuse the action of the prosecutor. I mean, I agree with Judge Oldham. Judge Oldham, I have a couple of questions. Go ahead. He's covering his eyes. Let me ask this, and I'm serious. Pietro Paolo, is your office, the United States Attorney's Office for the Western District of Pennsylvania, justifying the conduct of an assistant U.S. attorney, in this case, in face of, forget about whether the other side is entering it, in face of time after time, there was the judge who said, you should not be doing this, that is not relevant, and so forth. And finally, he says, I'm afraid that you've gone too far already. Now, is your office, is your office justifying that type of conduct? Your Honor, I... Vis-a-vis the judge. I'm sorry, I didn't hear the end of your question. Vis-a-vis the judge. I'm talking about the conduct of the assistant United States attorney, in face of admonition after admonition by the judge. Are you defending that sort of conduct? Your Honor, my job is to represent the department, and to represent as best I can. Am I proud of this, personally? No, I'm not. But the trial attorney has the right to have the case heard and an adjudication made. It's my job to try to put that in the best light. And I think Judge Fuentes made the point of, is this an error that can be overcome by the evidence that the jury did hear? And our submission is that it is. You need a soft, slow pitch, I think, which is prejudice. So how did, as bad as this prosecutor was, as off the reservation as he was, how did that prejudice the issue of possession of a shotgun? I don't think it did, Your Honor. There was sufficient evidence before the jury to still convict him. We have Marina saying, I twice saw this. He held it in my face. It had the tape on it that was on the tape on the scale. You had Palmer saying. I'm sorry? You said Palmer. Palmer, that's correct. Palmer testified he twice held it in my face. The tape on the handle to the tape on the scale. And I understand all that. The problem is that it seems to reward the prosecutor for outrageous conduct in this case. And maybe you really don't know what the jury was focusing on when they went into the deliberation room, whether they were focusing on drugs or the evidence respecting the shotgun. Well, I will remind the court that not only did the district court instruct the jury at one point during the trial about the limited purpose of the evidence, but during the instruction given prior to deliberations, it was reminded, the jury was reminded through the instructions, here are these two counts, and multiple times by the district court during those instructions, what lawyers say is not evidence. During the closings, the point was made, what lawyers say is not evidence. So I think there was sufficient information there with the presumption that juries followed their instruction that they did disregard that evidence. The appellant argues in his brief that the district court didn't balance relevance and prejudice, which the district court has to do. He meant, the appellant recognizes that the district court mentioned it, but argues that the district court didn't analyze it and recognize that the prejudice could be substantial. Can you show us where the district court did the kind of analysis of the prejudicial evidence and the probative evidence? If you look back at the record, the discussion is quite long between the prosecutor and the district court as to where this evidence is going to come in, why it's going to come in, and I would refer the court back to... You're talking about the balancing issue. Right. I would have to reread it to see if he actually used the word balancing, but I would submit that within that discussion, it's inherent that he's talking about the balancing. And even when he issues his ruling, I believe that he says that he's going to, that the balancing was, yeah, he said that on page 75. In balancing, I don't think the prejudicial impact outweighs the probative value. They've gone into prior to that. He says it, and the appellant recognizes that, but says it wasn't really analyzed. I think if you go back through the record, the detailed discussion does show that. I think that it does. And keep in mind that the objection that's made when the discussion's going on prior to trial, there's no objection made about whether that balancing was properly done. So we're at plain error on that. Well, that's right. We may be. Did Morena object when the evidence went to the jury room? Wasn't that a real problem in this case? No, he did not. In fact, I think he consented to all that. I know there's a pretty lengthy discussion at the end of the record when the jury was out as to what was going in, and he did not object. I don't understand what the judge did in this case, because the judge kept recognizing that the drug evidence was prejudicial, kept telling, instructing, but then didn't actually exclude it or order a new trial. This was only a two-day trial, right? Two or three, I think. It was relatively short. Actually, at one point he said, I'm about to declare a mistrial. He did. And he said, if you step over this line, I will. And at that point, nothing else happened. So the prosecutor was listening to what the district court had to say. And the defense lawyer — The prosecutor wasn't following what the district court said. That's very clear. Well, he doesn't go beyond that point. Once Judge Cercone drew the line in the sand, the prosecutor did not go over it again. That's pretty clear from the record. But the other thing that didn't happen is defense counsel didn't take up the mantle and say, wow, he just suggested if I made a motion, it would be granted. But your responsibility is different than that of the defense counsel. We all can see the defense counsel was terrible. But the U.S. attorneys — and, you know, Judge Woldesert, I don't know if you know, but Judge Woldesert came out of the Western District of Pennsylvania. He was a district judge there, and his chambers were there when he was on this court as an active judge all the time up until he went to California. I think we could have him back. That would be great with us. But I do recognize that. I would be happy to have him back, and then we'd have him physically here. But I've seen him in California, and I don't think he's coming back so soon. Well, he's in Santa Barbara. I can't blame him. Are there any other questions? Ruggie, do you have any more questions? No. Okay. Why don't we hear from — Thank you. And let's see if she can do a better job than we've done so far in telling us. Why don't you answer Judge Fuentes' question, which is, assuming both counsel did not act up to the standards that we really expect counsel to follow, what was the prejudice in this case that requires a reversal? I go back to what Judge Aldersart said earlier, where you have a district court judge saying 90 percent of this case was about drugs and 10 was about the gun. And it's more important than that, because that 90 percent wasn't about Billy Morena's drug dealing. It was about unrelated third parties' heroin dealing that was totally and completely unconnected to him by the evidence.  But that may not do it, because there's actual physical possession of a shotgun. And that's what he was convicted of. How did the evidence concerning drug activity and drug dealing influence the jury so that the jury was led astray? I think that would be the question. First, we have no way of knowing what the jury found. They could have found him guilty based on constructive possession and rejected Mr. Palmer's actual possession testimony. And if that's the case, then that's why this is so awful. And we have the Moore case, which tells us, touching on what Judge Slaughter said earlier, motive. No, motive is not an element. It was the same kind of case there. Yeah, but your predecessor counsel didn't object. No, he didn't. But the failure to object, again, doesn't relieve the government of its obligation to follow the rules of evidence and, more importantly, to ensure that a trial is fundamentally fair. Do you think it's enough to say that we're not really sure what the jury, what evidence the jury was influenced by, whether there was a spillover effect of the drug evidence, causing the jury to focus to the victim of the only charge that they had before them, which was possession of a gun? And Moore goes there and says we can't know, given the evidence that came in, whether the jury convicted him because they believed it was a heroin dealer, a crack dealer, an obstructor of justice, an unreformed convict, or just because they thought he had the gun in his house. It's so much more than the drugs that came in through the prosecutor's repeated, I think, flouting of the district court's order. I do want to say this for the record. I must apologize that I referred to your adversary as you. That's okay. Her name was Irwin, so please pardon my using your lovely name. But you pronounced it beautifully, so that's all that matters. Ah, that's the Italian. Peter and Paul is a great part of my religion, and seeing a name that combines both is very fascinating to me. Your Honors, I know that this wasn't the issue that you were interested in, but I really firmly believe that one of the reasons you weren't interested in the conflict issue was because I didn't brief it as well as it should have been briefed. Don't blame yourself. You briefed it. Well, I say that because I've done so much more research since I briefed the issue, and I did file the 28J letter. There was a waiver. I mean, the defendant waived a bad lawyer. No, there was no waiver, actually, Your Honor, no waiver on the record, absolutely. The court asked him a bunch of questions and told the defendant, told the defendant, you are subject to disciplinary proceedings somewhere. Do you understand that? Serious conflict. Yes, yes, yes. You still want this lawyer. Didn't say bad lawyer. You still want this lawyer. Yes, I want him. He understands me. Isn't that a waiver? The single thing that he explained to him was, if you rule to show cause while you shouldn't be disbarred and the Western District of Pennsylvania comes down while you're in trial, do you understand that could create a problem? They cleared up that it probably wouldn't create a problem, and he said yes. What Mr. Moreno never understood. Do we have to reach this issue if we agree with your first issue? Not if you agree with me, but my fear is that you might not agree with me on that issue, in light of the discussion about the prejudice. Sometimes advice is quit while you're ahead. We had that once in an embank, Ruge, if you remember. Yes, right. Okay, well, if you instruct me to quit while I'm ahead, then I will definitely. No, no, I instruct you. He's giving you the opportunity. I will. It's so hard for a lawyer to just shut up, isn't it? You have 28 seconds. Fully eight seconds. All right, I will shut up, even though it goes against the grain, doesn't it? But I thank you very much for your attention to the case. Thank you both. It's an interesting case, and we really do not put the responsibility on the lawyers to argue this, but you can obviously tell our concern, because our concern is greater than just this case. Our concern is what's going on. Certainly. Thank you. Thank you. We will take the next case.